105  311
106  290

## J. W. HUNT, Administrator of the Estate of ELENDER SAMPSON, Deceased, v. S. C. JOHNSTON AND JOSEPH JOHNSTON, Appellants.

**Fraudulent Conveyance:** EVIDENCE: *Father and child.* One who was insolvent, during the time of his indebtedness to plaintiff, conveyed to his son a quarter section of land and some town lots, and the son paid certain debts of the father in consideration therefor. The father had at one time considerable property and the son had nothing; and subsequently the son had considerable property and the father had nothing, without sufficient income belonging to the son, or losses upon part of the father, to account for the change. The son denied, upon being assessed, that he was possessed of money or credits, and acted as financial agent of the father, and collected money belonging to the father, without sufficiently accounting for it. *Held,* that the circumstances justify a finding that the conveyance was made to hinder, delay and defraud the creditors of the father.

BURDEN OF PROOF. One who acts as confidential agent or banker for his father must be able to show on a creditor's bill to subject to the payment of a judgment against the fathers' property of the son claimed to have been purchased with money belonging to the father, that he has accounted for all that he received from the father, where he collected a large amount for him and kept no account of the same.

SUBSTITUTION OF PLAINTIFF: *Order nunc pro tunc.* Where, for the trial of an action, the plaintiff's administrator is substituted for the original plaintiff, but judgment is taken in the name of the original plaintiff, which judgment is subsequently corrected in that respect, but the order correcting it is not signed until after an action in the nature of a creditor's bill to subject the property to a judgment has been begun on the judgment by plaintiff's administrator, the order may be made *nunc pro tunc,* and, when entered, cures the defect in the judgment, and validates all subsequent proceedings thereon.

**Judgment:** PRAYER. A decree in a creditor's bill for the cancellation of certain notes and mortgages alleged to constitute the consideration for the conveyances sought to be set aside is improper, where there is no prayer in the petition for the cancellation of such mortgages and no reference of any kind is made to them.

**Pleading:** REPLY. A reply asking that certain notes and mortgages, alleged to constitute the consideration for conveyances sought to be set aside, be canceled of record should be stricken from the files where no such relief was sought in the complaint, and the answer was simply a denial.

*Appeal from Marion District Court.*—HON. JOHN A. STORY, Judge.

TUESDAY, MAY 10, 1898.

CREDITORS' bill to subject certain real estate standing in the name of S. C. Johnston to the payment of a judgment held by plaintiff against Johnston & Frush and Joseph Johnston. The trial court subjected the property to the payment of the judgment, and defendants appeal.—*Modified.*

*Geo. W. Crozier* and *Earle & Prouty* for appellants.

*L. N. Hays* and *J. D. Gamble* for appellee.

DEEMER, C. J.—Elender Sampson, deceased, had a suit pending at the October term of the Marion county district court against the defendant Joseph Johnston. On the second day of that term, J. W. Hunt, his administrator, was substituted as plaintiff; but the case, for some reason, proceeded to judgment in the name of the original plaintiff. This suit was commenced November 15, 1895. Prior to the bringing of the action, an execution issued on the judgment as rendered, and was returned, "No property found." On the twelfth day of the following December the district court, on motion, made an order correcting the judgment entry so as to show that the judgment was in fact entered in favor of the substituted plaintiff. This order was not signed by the judge until the trial of this case, in March, 1896, when the omission

was discovered; and the court then and there, on motion of appellee's counsel, had the record of the former term read and signed. Appellants contend that, as no judgment existed in plaintiff's favor at the time this suit was commenced, he cannot recover. Their argument is based upon the proposition that a creditors' bill will not lie until judgment is recovered. This may be accepted as a general rule,—although there are some exceptions,—but it does not follow that the case should be dismissed. It must first appear that there was no judgment in fact. The entry of December, 1895, was in reality a *nunc pro tunc* order for judgment. It was in fact nothing more than making of record that which had theretofore been done. In making the order the court necessarily determined that the judgment, as originally rendered, was in favor of this appellee, and that the entry showing judgment in favor of the deceased was an error. This ruling is not appealed from, and no error is assigned thereon. We must assume that it was properly entered *nunc pro tunc*. When so entered, it cured all existing defects, and validated all subsequent proceedings thereon. See *Doughty v. Meek*, 105 Iowa, 16. The cases of *Gilman v. Donovan*, 53 Iowa, 362, and *White v. Secor*, 58 Iowa, 533, are not in point, for the reason that in neither was there in fact a judgment for the substituted plaintiff, but in each there was an attempt to have one rendered as of the date when the judgment in favor of the deceased was obtained. In these cases the remedy could only be under section 3154 *et seq*. of the Code of 1873, while in the case at bar it was properly by motion for a *nunc pro tunc* entry.

II. Appellee denies the jurisdiction of this court, on the ground that the clerk of the district court was not paid or secured his fees for making a transcript until more than a year after the appeal was taken.

The record discloses, not only that the clerk waived this requirement, but that an approved bond was in fact given on May 25, 1897. The bond, even if required, was given in time, and the appeal was properly perfected. *Harrison v. Palo Alto County*, 104 Iowa, 383; *Fairburn v. Goldsmith*, 56 Iowa, 348; *Slone v. Berlin*, 88 Iowa, 205; *Bruner v. Wade*, 85 Iowa, 666.

III. We come now to the merits of the case. Plaintiff's judgment was obtained, as we have seen, in October, 1895. The defendants in judgment were Johnston & Frush and Joseph Johnston, the defendant herein. On the twelfth day of June, 1895, and at a time when defendant Joseph Johnston was indebted to Elender Sampson, he (Johnston) conveyed to S. C. Johnston, his son, one hundred and sixty acres of land, and certain town lots in the city of Knoxville, for the expressed consideration of ten thousand dollars. At the same time he executed mortgages upon all his remaining property, real and personal, to his creditors, of which there were many. These mortgages were executed without the knowledge of the mortgagees, and some of them were never accepted. He also assigned his books of account and notes to a daughter. The conveyance of the real estate to the son, S. C. Johnston, is challenged because made with intent to hinder, delay, and defraud creditors. Defendants claim that the consideration for the conveyance was composed of the following items: *First*, a note executed by Johnston & Frush to E. M. and H. Kent, trustees, for the sum of two thousand and eighty-nine dollars and seventy-five cents, secured by a mortgage upon the land; *second*, a note executed by Joseph Johnston to one Kimmerer for the sum of one thousand and forty-seven dollars and eighty-six cents; *third*, a note executed by Joseph Johnston to one Messenkopf, for the sum of two thousand, seven hundred and six

dollars and sixty cents, and secured by mortgage upon the property; *fourth,* an indebtedness of Joseph Johnston to F. N. Bellamy, guardian, for the sum of one thousand, five hundred and thirty-four dollars and nineteen cents; *fifth,* some items of account due from J. Johnston & Son and Johnston & Frush; *sixth,* cash advanced to and for J. Johnston, amounting to one hundred and twenty-eight dollars and eleven cents; and, *seventh,* taxes paid by S. C. Johnston upon the property. S. C. Johnston claims that he purchased the notes mentioned as items, one, two, and three; that he assumed the payment of item four, which was a valid indebtedness to the guardian; that J. Johnston & Son and Johnston & Frush were indebted to him as stated; that he advanced the cash as claimed; and that the conveyance was made in satisfaction of these various items. The evidence shows, without dispute, that S. C. Johnston took an assignment of the Kent, Kimmerer, and Messenkopf notes, and that he gave his individual checks for the amount thereof at the time he took the assignments. It also appears that he assumed the payment of the Bellamy note, and that he, nominally, at least, furnished money to and for his father as claimed. And there is at least *prima facie* evidence that the firms of which we have spoken were indebted to him in the amounts claimed. The payments to which we have referred were nearly all made by checks drawn in the name of S. C. Johnston. While admitting all these facts, appellee claims that the money in fact belonged to J. Johnston, the father, and that when S. C. Johnston took the assignments of the various notes, and made the payments claimed, he used money belonging to his father; that the transaction, in so far as it related to any of the obligations of Joseph Johnston, was in fact a payment, and not a purchase thereof. He also claims that the conveyance was made as a cover

to hinder, delay, and defraud the creditors of Joseph
Johnston. The burden is, of course, upon appellee to
establish these claims. The evidence relied upon is to
the effect that the parties are father and son; that the
son acted as financial agent or banker for the father;
that the father was at one time possessed of a large
amount of property, and the son had nothing; that the
son is now possessed of a large amount of property, and
the father has nothing; that the father had no serious
losses at any time, and that the son had no such income
as would account for the large amount of property in
his hands; that the father in fact furnished the con-
sideration for the payment or purchase of the Kim-
merer note, by making a loan upon his lands, and turn-
ing the amount over to his son; that the son collected
the accounts and rents belonging to the father, and has
not made a sufficient accounting thereof; that the con-
veyance was made to the son at a time when the father
was insolvent, but without particular solicitation on
the part of the son; that at the same time the father
made a conveyance of his homestead to his wife, and,
without solicitation, made mortgages upon all his
remaining property to his creditors; that the son, when
being assessed, denied that he was possessed of any
moneys or credits; that the son was already secured
when the conveyance in question was made, and that
no creditor was then pressing the father; that the
father at the same time assigned all his notes and
accounts to a daughter; that the son knew the father's
financial condition, and took the conveyance for the
purpose of thwarting the father's creditors. These,
with some others, are the claims relied upon to show
fraud in the conveyance. We will not undertake to
review all the evidence relied upon to support these
claims. It is our practice, in such cases, to state con-
clusions only. That the son did act as a financial

agent, and to a certain extent as manager, for the father, is beyond dispute. He collected notes and accounts of the old firm of Johnston & Frush, and of the firm of Johnston & Son. He collected rents for the use of the real estate owned by his father. He was his father's trusted adviser. Father and son both claim, however, that all money so collected was properly accounted for; and it is true that all money which was deposited in the banks in the name of J. Johnston is accounted for. But the son had a very large deposit account, which is hardly explainable on any theory other than that it was made up from money received from his father's business or rentals. The son had no income which would account for so many and so large deposits as appear to his credit in the various Knoxville banks. He kept no account of the money collected for his father, although he admits having received large sums from time to time. True, he says that he properly accounted for all that he received. But in an action of this kind, where confidential and trust relations are established, the trustee must act in the utmost good faith, and must be able to show by clear and satisfactory evidence that he has accounted for all that he has received. The state of his bank account is not explainable upon any other theory than that it was increased from time to time by large amounts, which he does not satisfactorily account for. The father does not show any great losses in his business; that is, enough to account for the large shrinkage in his property during the last ten years he was in business. And the son's account grew about as fast as the father's assets were depleted. The consideration for the payment or purchase of the Kimmerer note was undoubtedly furnished by the father, who made a loan for this purpose. The son claims, however, that, while the father obtained the money in

this manner, yet he (the father) was indebted to him (the son) upon a note for one thousand, nine hundred and seventy-one dollars, and that so much of the money which the father borrowed as would take up the Kimmerer note was applied upon the note the son held against the father, and the son took the money, and purchased the Kimmerer note, and returned the balance of the loan, amounting to nine hundred and fifty-two dollars and fourteen cents, to the father. Such an arrangement is possible, but it is hardly probable, in the light of the record. The note for one thousand, nine hundred and seventy-one dollars is claimed to be lost, and the books of Johnston & Son and Johnston & Frush, introduced in support of some of appellants' claims, do not bear the impress of truth. At the time appellant S. C. Johnston claims to have purchased the Messenkopf and Kent notes and mortgages, he (Johnston) was engaged in the erection of buildings upon his own account which called for considerable sums of money. True, at this time he was making large deposits in the banks, but he was engaged in no business which would produce such returns. We are constrained to believe that the money which he was so using and depositing came from Joseph Johnston. The assumption of the debt to F. N. Bellamy seems to be established, and it further appears that S. C. Johnston, after he received the deed, made a mortgage to secure this debt upon the farm lands secured by him. There is in the record evidence of the alleged purchase by S. C. Johnston of many other notes made by his father to third persons. This evidence is not wholly satisfactory, and is evidently furnished to account for some of the large transactions appearing upon the bank books containing S. C. Johnston's account. The reasonable theory of these transactions is that S. C. Johnston used his father's money in paying these debts, and, instead

of having them canceled, procured their assignment to himself. S. C. Johnston knew when he received the conveyance in question the amount and extent of his father's indebtedness. He knew that he could not long continue in business. If he owned the notes and mortgages, as he now claims, he was quite secure, and did not need the deeds for his protection. The sister to whom Joseph Johnston assigned his notes and accounts was not pressing her claim; the general creditors were doing nothing to cause alarm; and yet Joseph Johnston makes the deeds, mortgages, and assignments referred to, and thus places everything beyond the reach of those creditors who were not secured, or who did not see fit to accept the mortgages made. The circumstances point to the conclusion that the conveyances were made to hinder, delay, and defraud the creditors of Joseph Johnston.

Appellants further argue that the court was in error in setting aside the mortgages upon the land, which it appears were not canceled by S. C. Johnston after he received the deeds from his father. The original petition does not ask such relief. It simply asked that the conveyances from father to son be set aside. The defendants filed a general denial. After the case was submitted, and had been taken under advisement, the plaintiff filed a reply, in which he asked that the notes and mortgages which defendants say, in evidence, constituted the consideration for the conveyances, be set aside, and canceled of record. Thereafter defendants moved to strike this reply, for the reason, among others, that it asked relief not sought or prayed for in the original petition, and set up matters which should have been pleaded in the petition. This motion was overruled. As the cause is triable *de novo*, such ruling is subject to review. From

the statement made, it is apparent that the reply introduced a new cause of action. True it is that appellee might have amended his petition to make the pleading conform to the proofs, but this he did not do. In the case of *Marder v. Wright*, 70 Iowa, 45, it is said: "A plaintiff is not permitted to plead in his reply matters which are material only to the cause of action alleged in his petition. Much less will he be permitted to recover on a distinct cause of action which is pleaded only in his reply." See, also, *Jones v. Marshall*, 56 Iowa, 739. The answer was simply a denial, and a reply is not permissible under such circumstances. Code 1873, section 2665. The reply should have been stricken from the files. With this out of the record, there was no prayer for cancellation of the mortgages, and no reference of any kind made to them in the petition. The decree, in so far as it undertook to satisfy and extinguish the mortgages, was without authority, and should be modified to that extent. In so far as it sets aside the conveyance of June 12, 1895, it is affirmed; and, in so far as it undertakes to satisfy and cancel the mortgages upon the property it is reversed.—MODIFIED AND AFFIRMED.